Hillsborough
No. 6576

STATE OF NEW HAMPSHIRE v. EDMOND M. GEORGE

December 28, 1973

*Sheehan, Phinney, Bass & Green (Mr. William L. Phinney* orally) for the defendant.

*Warren B. Rudman,* attorney general, and *Robert V. Johnson II,* assistant attorney general *(Mr. Johnson* orally), for the State.

PER CURIAM. The primary issue in this case is whether sufficient evidence was presented concerning the defendant's care or control of the premises of the Sahara Club, Inc., to sustain a conviction under RSA 577:6 for keeping a place resorted to for the purpose of gambling when the club was raided by the police on February 11, 1972. The defendant was found guilty in a trial by jury. The Trial Court *(King,* J.) reserved and transferred the defendant's exceptions to his denial of various motions requesting a verdict in favor of the defendant on the grounds that the evidence did not establish the defendant's care or control of the premises together with the defendant's exceptions to the admission of certain evidence during the course of the trial.

RSA 577:6 reads that "No person shall keep any house, shop, or place resorted to for the purpose of gambling, or let any such place for that purpose, or suffer any person to gamble in any way in any such place, which is under his

care or control." This statute was interpreted in *State v. Har-keem,* 97 N.H. 508, 92 A.2d 906 (1952), to require that the person allegedly violating the provisions must be proven to have kept a house that was used on a series of occasions for the purpose of gambling. The statute also establishes as an essential element of the crime the necessity of proof that the alleged violator had the premises under his care or control.

In the present case there is no dispute concerning the sufficiency of evidence relating to gambling at the Sahara Club, Inc., on a series of occasions. Rather, this appeal focuses on the issue of whether or not the evidence supports a conclusion that the defendant was responsible for the care or control of the premises. The trial record discloses that the Sahara Club, Inc., previously named the Syrian American Citizens Association, was formed as a voluntary corporation under RSA ch. 292 to promote good relations between Syrian-Americans and provide a center for social recreation. The defendant signed the amendment to the original articles changing the name to Sahara Club, Inc., as an incorporator and appears to have been its secretary-treasurer in 1971. On January 26, 1971, the club executed an agreement to lease a building located on 102 Spruce Street in Manchester from the defendant for a period of five years. The defendant retained the unlimited authority to "sublease" either floor of the two-story building.

The testimony of various witnesses indicates that the Sahara Club, Inc., occupied the entire premises in 1971 and the early part of 1972. On the upper level, there was a dance floor with tables on the outer edges and a kitchen; on the lower level, there was a poolroom with a bar, a card room, several utility rooms and a locked room in which the defendant's personal office was located. The poolroom was provided with a pay phone and an extension behind the bar. A regular phone was also situated in the defendant's office with an extension next to the pay phone.

One witness, Nicholas Carozi, testified that he himself was a gambler and had personally made bets on the lower floor of the club with the defendant, who was frequently present. He described an incident where he was denied payment by

the defendant when he had a "hit" in the numbers game. The defendant called him into his office and threatened him with violence if he went to the police to complain. This witness also testified that the defendant was present on the lower floor when another individual, Charlie Nassoura, was accepting bets from various persons.

There was also testimony that during the raid on February 11, 1972, several calls were received by a police officer on the pay phone for the defendant, who was not present for approximately the first half hour of the search. One of these calls was from an individual who identified himself as Giroliman and specifically asked for Charlie Nassoura or the defendant, and when he was informed that neither was present, he placed a bet with the officer. Another call was from "Jimmy" who, without asking for anyone by name, simply inquired whether he should "go to work" and was told to do so by the officer.

In our view sufficient evidence was presented to support a finding by the jury that the defendant was in control of the premises. In *State v. Canney*, 112 N.H. 301, 294 A.2d 382 (1972), we said that "It is within the province of the jury to draw reasonable inferences from the facts proved. Furthermore the jury can also draw inferences from facts which they found as a result of other inferences provided they can reasonably be drawn therefrom .... Guilty verdicts having been rendered, in determining on this appeal whether the evidence was sufficient to prove defendants guilty beyond a reasonable doubt, the evidence is to be construed in the light most favorable to the State with all reasonable inferences therefrom" (citations omitted). *Id.* at 302-03, 294 A.2d at 383.

As a general rule where an owner of a place, which is not kept for the purpose of gaming, allows gaming to be carried on and participates in such activity, he may be convicted as a keeper of a gaming place. *State v. O'Neal*, 210 S.C. 305, 315, 42 S.E.2d 523, 527 (1947). Although the defendant leased the building to the Sahara Club, Inc., he retained the power to sublet a portion of the premises, occupied an office on the lower level and kept an extension of his private phone in the public part of the club. *Cf. Leonardo v. Great Atlantic and Pacific Tea Co.*, 340 Mass. 450, 453, 164 N.E.2d

900, 902 (1960). While these facts do not in themselves establish control, if they are coupled with other facts suggesting his frequent presence in the building, especially on occasions when gambling was being conducted, his acceptance of bets from various persons and his authority to determine whether or not bets should be paid, we believe that there is a reasonable basis on which to conclude that the defendant actively participated in supervising the conduct of gambling within the building under his control. *See Donald v. United States,* 102 F.2d 618 (D.C. Cir. 1939); *State v. Soasey,* 237 Ore. 167, 171-72, 390 P.2d 190, 192 (1964); *State v. O'Neal,* 210 S.C. 305, 315, 42 S.E.2d 523, 527 (1947). Accordingly, we sustain the court's denial of the defendant's motions.

The defendant's objections to the admission of certain evidence were primarily directed toward those facts establishing the presence of gambling at the Sahara Club, Inc., and were based on the assumption that the evidence pertaining to his care and control would not be proved. In view of the foregoing discussion, these exceptions are without merit. The defendant also claimed that evidence of an oral statement by the defendant in which he threatened Nicholas Carozi that "he would end up in the gutter" if he went to the police was prejudicial hearsay evidence and irrelevant to the present case. This statement was introduced to suggest the defendant was aware that wrongful activities were being conducted at the club on prior occasions. *Morley v. Clairmont,* 110 N.H. 12, 13-14, 259 A.2d 136, 137 (1969); *Ellsworth v. Watkins,* 101 N.H. 51, 53, 132 A.2d 136, 138 (1957); 1 Wharton, Criminal Evidence §201 (13th ed. 1972); 2 J. Wigmore, Evidence §367 (3rd ed. 1940, Supp. 1972); 4 J. Wigmore, Evidence §1048, 1060 (Chadbourne rev. 1972). In our view evidence of this threat was not unduly prejudicial, and the order is

*Defendant's exceptions overruled.*